## Railroad Supply·Company v. Adolph Klofski.

### Gen. No. 13,603.

1. FELLOW-SERVANTS—*when doctrine of, does not apply.* The fellow-servant doctrine has no application where the charges of negligence are with respect to the non-delegable duties of the master.

2. PLEADING—*when declaration sufficiently charges that the incompetency of the defendant's servants caused the plaintiff's injury. Held,* that the declaration set forth in this opinion sufficiently charged that the incompetency of the defendant's servants caused the plaintiff's injury.

3. PLEADING—*when declaration sufficiently charges that the failure of the defendant to furnish a safe place to work was the cause of the plaintiff's injury. Held,* that the declaration set forth in this opinion sufficiently charged that the failure of the master to furnish a safe place to work was the cause of the plaintiff's injuries.

4. MASTER AND SERVANT—*duty of former to latter.* It is the duty of the master to exercise reasonable care to provide for his servants a reasonably safe place in which to work, and this duty is a continuing one.

5.   MASTER AND SERVANT—*duty of former to latter.*   It is the duty of the master to exercise reasonable care to employ competent servants, and such as are fit for the work they are intended to be employed in, and to discharge an incompetent or negligent servant, if he learns or has reason to believe that he is incompetent or negligent.

6.   VERDICT—*how may not be impeached.*   A verdict of a jury may not be impeached by the affidavits of the individual jurors who ·rendered the same, nor by the affidavits of others setting forth the hearsay statements of any of such jurors.

Action in case for personal injuries.   Appeal from the Superior Court of Cook county; the Hon. GEORGE A. DUPUY, Judge, presiding. Heard in· this court at the March term, 1907.   Affirmed.   Opinion filed January 27, 1908.

Statement by the Court.   The appellee was plaintiff and the appellant defendant in the trial court.   The declaration contains two counts, in which it is averred in substance as follows:

First count.   Defendant, July 14, 1902, was engaged in the foundry business, in the manufacture of various iron and metal articles, and had for said purpose certain ladles, vessels or pots, with appliances attached thereto, filled with metal in a molten state, slag and other substances, in a dangerously high temperature and condition.   Plaintiff was employed by the defendant to work in said business as a moulder, and he and the servants of defendant were, on the day and year aforesaid, directed to take certain molten metal from a certain vessel, to be used by plaintiff and said servants in moulding brake-shoes or other articles manufactured in defendant's business.   It was then and there defendant's duty to use reasonable care to provide for plaintiff and its servants a reasonably safe place to work in, and to keep the floor and place around and about said vessel, filled with metal, in a dangerously high temperature, in a dry, even, and safe condition, clear of obstacles, so that plaintiff and the servants of defendant could work there in safety. Defendant negligently kept and maintained the floor, or place around and about said vessel, uneven, with holes,

wet, and obstructed with various iron articles, so as
to endanger the safety of those there employed, and
negligently permitted the same so to remain, etc., all
of which was known to defendant, but unknown to
plaintiff. And by reason of said negligence of defend-
ant, and while plaintiff was engaged in the exercise
of due care about defendant's business, a certain serv-
ant of the defendant tripped, slipped and fell to the
ground, while carrying molten metal in a ladle, oper-
ated by means of a handle from four to seven feet
long, and, by means of the premises, caused the metal
in said ladle to spill to the ground and explode, and
said metal was thrown against the head of the plaintiff
and injured him, etc.

Second count. This count avers the business of the
defendant, substantially as does the first, and avers
that it was defendant's duty to employ competent,
sober and careful servants, who would use due care
and caution while handling and operating ladles filled
with molten metal, for the safety of those engaged in
defendant's business. It is then averred that defend-
ant negligently employed an incompetent, careless and
reckless servant, and permitted said servant to work,
operate and manage ladles filled with molten metal,
of which incompetency of said servant defendant
knew, or by the exercise of reasonable diligence might
have known; but which was unknown to plaintiff. By
means whereof, and while plaintiff was in the exercise
of due care, and engaged in the said business, the de-
fendant, by its said servant, so negligently operated
said ladle, filled as aforesaid, that it caused the metal
in said ladle to spill, flow to and explode on the ground,
and said metal was thrown with great force to and
upon plaintiff and injured him, etc. The defendant
pleaded the general issue. The jury found for the
plaintiff and assessed his damages at the sum of $2,541.
The defendant moved for a new trial and in arrest of
judgment, which motions the court overruled and ren-
dered judgment on the verdict.

The defendant's foundry was a brick building about 300 feet long from south to north and about 100 feet wide from east to west. In it there were two furnaces, each about thirty feet long and six feet wide, situated about the center of the length of the building and next to the east wall. The north furnace was No. 1 and the south one No. 2, and there was between them a space of about twenty-five feet. In the east wall, opposite the space between the furnaces, there was a door to the switch yard. The fire boxes of the furnaces were fed with coal from the space between them, and the furnaces were fed with pig iron, scrap iron, steel, spruce and broken or worthless castings. There were railroad tracks outside the building along its sides, on which iron and other material for use in the foundry were brought to the building, and on the east side the iron and other material were wheeled in wheelbarrows and trucks through the east door and into the space between the furnaces and there piled. About forty tons of pig and other iron were put into the furnaces each day. There were four heats, two at each furnace, daily, and there were eight or nine tons to a heat. There were boxes of coal at the sides of the furnaces, and the passage between the boxes was about twelve feet wide. Each of the furnaces had two spouts, one on the inside, where the passage-way was, and one on the outside from the passage-way, from which spouts the iron, when molten, was received in ladles and carried to the moulds. There were about 100 men working in the foundry at the time of the accident, fifty-five or sixty of whom were moulders and the remainder common laborers. There were two classes of moulders, floor moulders and bench moulders. The greater number of the floor moulders worked on the south side of the foundry, south of the furnaces, and used large ladles called bull ladles, in which to catch the molten iron as it came from the spouts of the furnaces. Their ladles, when filled, were carried away by some of the common laborers. The bench moulders used hand ladles, which weighed between

twenty-five and thirty pounds each, and had handles about five feet long, and held from fifty to sixty pounds of molten iron, so that a ladle, when full, weighed from seventy-five to ninety pounds. The bench moulders, themselves, carried their ladles, when filled, to their places of work. Klofski, the plaintiff, was a bench moulder, his bench being situated north of the furnaces. On the day of the accident, between eleven and twelve o'clock in the forenoon, when the usual signal to take molten iron from the furnaces was given, the plaintiff and others went to the north spout of the north or No. 1 furnace, to get the iron from it, but found the spout clogged, or, as the witnesses say, frozen up, when Joseph Wolf, the foreman, ordered them to go between the furnaces and take the iron from the south side of No. 1 furnace. The men obeyed the order and formed in two lines, the lines being in a V shape, the angle of the V being next to the spout. When these lines were thus formed, the man nearest the spout held his ladle under it to receive the molten iron, and when his ladle was full, if he was in the right line, he turned to the left, carrying his ladle to his bench, and if in the left line, he turned to the right and carried away his ladle, when the next man, in the opposite line, filled his ladle and did likewise, and so alternately. The plaintiff was in one of the lines, about fifteen feet from the spout, waiting for his chance to fill his ladle, when a bench moulder, called Scotty, turned from the spout, with a full ladle, to go west in the passageway between the furnaces and between the two lines of men, when he fell and spilled the iron in his ladle on the ground, and it exploded, burning and injuring the plaintiff. The plaintiff was about thirty-three years old at the time of the accident, July 14, 1902, and had then been in defendant's employ from the middle of March, 1902, or about four months.

F. J. CANTY, J. C. M. CLOW and E. E. GRAY, for appellant; H. E. LONG, of counsel.

F. W. JAROS, for appellee; FRANCIS J. WOOLLEY, of counsel.

MR. JUSTICE ADAMS delivered the opinion of the court.

Counsel for the defendant contend (1) that neither count of the declaration states a cause of action; (2) that a certain servant of the defendant, who threw down a poker in the place where plaintiff and other servants were working, Scotty, the servant, who is claimed by the plaintiff to have been incompetent, and certain laborers in defendant's employ were all fellow-servants of the plaintiff, and therefore there can be no recovery; (3) that the court erred in giving certain instructions for the plaintiff, and in refusing certain instructions asked by the defendant; and (4) that the court erred in overruling defendant's motion for a new trial.

The objection urged to the first count is, that it is not alleged in the count that the failure of the defendant to furnish a safe place to work was the cause of plaintiff's injuries, and that it is not averred in the second count that the servant who tripped and fell was not a fellow-servant of the plaintiff. Neither of these objections can be sustained.

In the first count, after averring negligence of the defendant in permitting the floor or place where the employes were working to be and remain with holes in it, wet, and obstructed, it is averred, "and by reason of the careless and negligent misconduct of the defendant aforesaid, while the plaintiff was in the exercise of due care and diligence for his own safety, and was engaged in and about the business of said defendant aforesaid, a certain servant of the defendant then and there tripped, slipped and fell, etc."

It is clearly averred in the count that it was by reason of the defendant's negligence in failing to exercise reasonable care to provide and maintain a reasonably safe place for its servants to work in, that

one of its servants slipped and fell, causing the molten metal which he was carrying in a ladle to fall to the ground, explode and be thrown against plaintiff.

The fellow-servant doctrine has no application to the present case, in which the charges are violations by the defendant of duties which it could not delegate to another. Deering v. Barzak, 227 Ill. 71.

The plaintiff's counsel cites cases to the effect that if there is any defect in the count, it is cured by the verdict, to which we think it is unnecessary to refer. The first count, as originally filed, contained the words "not a fellow-servant of the defendant," which words were stricken out by amendment, but defendant's counsel have abstracted the count as originally filed.

The objection urged to the second count is, that it is not averred in it that the incompetency of the servant caused the plaintiff's injuries. A mere reading of the count is sufficient to show this objection untenable. Next after the averment that the defendant negligently employed an incompetent servant and permitted him to work, is this language: "By means whereof, while the plaintiff was engaged as aforesaid, and exercised due care and diligence for his safety, the defendant then and there, by its said servant or servants, so wrongfully, carelessly and negligently operated said ladle, filled with metal, in a dangerously high and heated temperature as aforesaid, that it caused said metal or substance, in said ladle, to spill, flow and explode to and upon the ground, whereby said metal and substance was then and there thrown with great force and violence to and against the head, etc.,   *   *   *   of the plaintiff." The count plainly avers that the defendant, by its incompetent servant, negligently and carelessly operated the ladle, which can only mean that the incompetent servant actually and negligently operated it with the result stated in the count.

For convenience we will consider separately the evidence bearing on each count of the declaration, commencing with the first count.

Kroll, who was in one of the lines of men, waiting to fill his ladle, when the accident happened, testified: "There were piles of pokers, pig iron not used, slag not hauled out and brick lying in the passageway between the furnaces. The place where Scotty slipped and fell was uneven. The irons and pokers used for slag work laying there. Those pokers and iron were long iron rods used to poke the inside of the furnace; some of them were twenty feet long and some longer. I saw Scotty fall. He made a step and fell on the irons, and his ladle fell from his hands. There was a hole there cut by the wheelbarrows. It was as big and deep as my hat, measuring about five inches. The nearest poker lay right at the hole. I can't tell whether the irons or the hole was the cause of his fall." Witness further testified that the ground was wet, and that when melted iron is poured onto wet ground or wet iron, it explodes, and that the iron exploded and some of it went onto plaintiff; also, that the hole which he had described was there when he went to work in the foundry, six months before the accident. On cross-examination witness testified: "As you leave the furnace you can't see very well. You are liable to step over most anything. I saw him fall at that place where this hole was. I saw his toe up against the poker and I saw the poker lifted up by his foot from the ground. The poker was right alongside of this hole. I noticed that he stepped into this hole and then fell. He fell because the things were in the way there. He fell over the hole there."

John Schultz, a moulder in defendant's employ, testified as to the condition of the space between the furnaces, that there were holes in it as deep as his ankle, which had been there as long as he had worked there, which was over a year; that the holes were made by throwing down iron and brick, and wheeling in wheelbarrows. This witness did not see the accident.

Albert Vatek, a moulder, testified that there was a hole between the two furnaces where the men were catching iron, and that Scotty stepped into it.

John Novak, a moulder, testified that there was a hole in the passageway, and sprue, which is the breakage of castings, broken pieces of iron, and three bars or rods on one side and six on the other side, and that they lay on each other crosswise. On cross-examination he testified: "The hole and the pokers and hooks were only about three, four or five feet from the spout. He would take about three feet at a step, and it only took two or three steps from the spout before he stepped into the hole." On cross-examination, this witness testified that there were piles of sprue and iron lying in and scattered all over the passageway, and also bricks and coal; that the space between the furnaces was filled clear across with bricks, iron and other stuff, and that, when the men carried iron from the spout, they had to climb over it, and that the condition had been the same during the nine months witness had worked there.

The pokers are described by Mr. McElroy as one and one-quarter iron rods, twelve or fourteen feet long, and he says they were usually laid on the ground, except when being used.

The evidence for the plaintiff shows that when one is taking molten iron from the spout, the effect on his eyes is temporarily to limit their capacity for distinguishing things; also, that the bench moulders, who carry their own ladles, when filled, have to run or move very rapidly away from the furnace to their moulds, because, if they do not, the iron may cool and become unfit for moulding. This is not contradicted, but is corroborated by Mr. Mair, the labor foreman, who testified: "The hand ladles will cool more rapidly than the bull ladles, and the men carrying hand ladles would have to be more expeditious and rapid, to keep it from chilling, than those carrying the bull ladles."

The evidence for the plaintiff is, that before the day of the accident the bench moulders did not take molten iron from the spouts inside the passageway. John Schultz testified that he had worked there more than a

year, and that, before the time of the accident, the single ladles were filled from the outside and the bull ladles from the inside, between the furnaces. Kroll testified that the bench moulders always took the iron from the outside, when the spout was not frozen, and that the men with the bull ladles took iron from the inside, and that both spouts were always running when there was a heat, except on the day of the accident. Vatek, a bench moulder, testified on cross-examination that he never drew iron between the furnaces till the time of the accident. John Novak testified that during the nine months he worked there he never took iron from the inside of the furnaces, but always from the outside. The plaintiff testified: "Before the day of the accident we always got iron from the outside of the furnace. The bull ladles took their iron from the inside. Before the day of the accident I did not go between the furnaces." The uncontradicted evidence is, that the foreman, on the day in question, ordered the bench moulders, including the plaintiff, to take the iron from a spout in the passageway between the furnaces.

The defendant called three witnesses—James McElroy, the defendant's timekeeper, Charles Mair, defendant's labor foreman, and Joseph Wolf, defendant's general foreman. McElroy's duties, according to his evidence, were to keep the time of the men, and to examine the castings, which he did in the discount room, separate from the foundry and about 150 feet distant from the furnaces. The following question was asked him and answer given:

"Q. You did not have any duties to perform between these furnaces, did you? A. Well, sometimes I would have to go down there with castings that were coming in bad, and show them to the foreman, or to the superintendent, to stop them. Generally the superintendent was situated between the furnaces."

This witness testified that, from November, 1901, till July, 1902, when the accident happened, he saw no holes in the floor between the furnaces, that there

were none there; that there were piles of sprue or cast-ings alongside the furnaces, but not in the passage where the men walked; that he never saw any obstruc-tions. there of iron or anything else, or any hole in the floor. On cross-examination he testified: "I did not concern myself as to whether there were holes in the floor between the furnaces or not."

Charles Mair, the labor foreman, testified that some-times the spouts of the furnaces did not work well, and then the men worked indiscriminately either on the inside or outside of the furnaces. Also, that he never saw any holes in the floor between the furnaces, or any-thing there except necessary coal which was kept in a box, and that there was no sprue in the way of the men; that there might possibly be some stuff there, but he did not know whether there was or not.

Joseph B. Wolff testified that the floor between the furnaces was not cluttered up with heaps of iron, brick, coal, or anything else, and that there was no hole in the floor, or any material except a poker about twelve feet long. This witness also testified that before the day of the accident plaintiff worked between the fur-naces; that he had seen him there many times. On recross, he testified: "I know that Klofski must have been between the two furnaces, because I know his duties took him there." In this conflict of the evidence it was clearly for the jury to decide whether the place between the furnaces was or not a reasonably safe place in which to do the work which plaintiff was en-gaged in doing, and if not, whether the defendant knew the place was unsafe and obstructed, as testified by plaintiff and other witnesses, or by exercising ordi-nary care would have so known, and whether plaintiff, before going to work there, at the time of the accident, knew, or by the exercise of ordinary care would have known, the condition of the place.

It is well settled that it is the duty of the master to exercise reasonable care to provide for his servants a reasonably safe place in which to work, and this is

a continuing duty. Am. & Eng. Ency., 2nd ed., p. 88; C. & E. Ill. R'd Co. v. Kneirim, 152 Ill. 458; C. & A. R. R. Co. v. Eaton, 194 Ill. 441; Deering v. Barzak, 227 Ill. 71.

In the last case the court say: "The duty of the master to use reasonable diligence to furnish the servant with a reasonably safe place in which to work is one of those primary and continuing obligations cast upon the master by the law which cannot be delegated to another." The case is similar to the present. In that case the plaintiff, while carrying a ladle filled with molten metal, fell by reason of an obstruction which it was claimed was placed in the gangway by a fellow-servant of the plaintiff. The court say: "If the gangway through which appellee would have to pass on his return was obstructed and unsafe, which was known, or by the exercise of reasonable diligence would have been known to the foreman, in time to have removed the obstruction before the accident, and appellee was ignorant of the unsafe condition and free from the imputation of contributory negligence, appellants are not absolved from their duty to use reasonable diligence to restore the gangway to a reasonably safe condition because it had become unsafe through the agency of a fellow-servant of appellee." Citing numerous authorities.

The evidence for the plaintiff in this case is amply sufficient to sustain a finding that the passageway between the furnaces was obstructed and unsafe, and that the defendant knew this, or by the exercise of reasonable care would have known it in time to make it reasonably safe, and that the plaintiff did not know of the condition of the passage, and had not equal opportunity with the defendant to know of it.

We will next consider the evidence bearing on the alleged incompetency of Scotty, the servant who fell, spilling the molten iron which he was carrying on the ground. The averment of the declaration is that the defendant negligently employed an incompetent and

careless servant and permitted him to work, etc. It is the duty of the master to exercise reasonable care to employ competent servants and such as are fit for the work they are intended to be employed in, and to discharge an incompetent or negligent servant if he learns or has reason to believe he is incompetent or negligent. Wabash Ry. Co. v. McDaniels, 107 U. S. 454; Bailey on Master's Liability for Injuries to Servant, p. 47; Labat on Master & Servant, sections 177, 185. This author says: "Incompetency is inferable where a servant is addicted to vicious habits, which diminish his physical and mental efficiency and render him less trustworthy; the most common kind of incompetency under this head being that caused by intemperance in the use of intoxicating liquors." *Ib.*, sec. 185. The author also says the duty is a continuing one. *Ib.*, sec. 8.

Kroll testified that on the day of the accident Scotty was drunk; that he could tell this by the way he carried himself; that he had seen him drunk in the foundry on other days before the accident; that four or five times he was so drunk that he had to quit work. Schultz testified that in the morning of the day of the accident he saw Scotty in a saloon drinking whiskey, and that he was drunk at the time of the accident; that he had known him a long time, both at Deering's and defendant's place, and that he was drunk almost every day; that witness worked on Scotty's bench one time and found half a dozen whiskey bottles there; also, that he was staggering from side to side when he got his iron, at the time of the accident.

Vatek testified that Scotty was his partner, and that when he came to work the morning of the day of the accident he was drunk; that he had whiskey with him in a beer bottle, and drank it, and that he was drunk all the time he worked in the defendant's place, whenever he had money; that witness saw him when he started to catch iron at the time of the accident, and he staggered from side to side.

Novak testified substantially as did Vatek.

The witnesses for defendant testified in substance as follows: McElroy testified that he never saw Scotty drunk in the foundry, and that he was not drunk and did not stagger the day of the accident. Mair, the labor foreman, testified that he knew there was a man there by the name of Scotty, but he was not acquainted with him; that he was not under him, and that he never saw him drunk in the foundry. On cross-examination he testified that he had seen Scotty drunk occasionally, and that he saw him lying drunk on one of the tracks alongside the foundry; that he did not remember ever having seen him put out of the shop in an intoxicated condition; that he may have seen him in that condition, but did not remember it. Wolf, the general foreman, testified that he had seen Scotty drunk around the foundry; but to witness' knowledge, he had never seen him drunk at work in the foundry.

The testimony of plaintiff's witnesses, who were Scotty's fellow-workmen, one of whom had known him for twelve and another for fourteen years, and all of whom worked at the foundry while he did, is, in substance, that he was an habitual drunkard. Whether Scotty was incompetent was clearly a question for the jury, as between these witnesses and defendant's witnesses. If Scotty's habit was as testified by the plaintiff's witnesses, the defendant must either have known this, or by exercising reasonable diligence would have known it. Western Stone Co. v. Whalen, 151 Ill. 472; C. & A. R. R. Co. v. Sullivan, 63 *ib.* 293; Ill. Cen. R. R. Co. v. Smiesni, 104 Ill. App. 194; Staunton Coal Co. v. Bub, 119 *ib.* 278.

Other authorities will be found in the cases cited.

Klofski testified that Scotty worked at a bench about ninety feet from the bench at which he worked; that he first saw him about a week before the accident, and that he did not know him or anything about his habits. Wolf testified that plaintiff worked on the north side and Scotty on the south side of the furnaces, and that

these places of work were about 100 feet apart, and that he could not tell whether or nòt they, when at work, could see each other; that there were four heats each day, and the men worked together at heats. It is to be noted, however, that the moulders worked by the piece, and each one was anxious to take his iron from the furnaces as soon as possible, and consequently was looking out for himself. The evidence shows that the defendant had a superintendent, one McGill, who, McElroy testified, was generally between the furnaces, a general foreman and a labor foreman, and it was a question for the jury whether plaintiff knew of Scott's habit of intoxication, or whether he had or not as good an opportunity as the defendant to know of it.

We find no reversible error in the giving of plaintiff's or the refusal of defendant's instructions. The court gave twenty-six instructions for the defendant, some of which were much more favorable to the defendant than it was entitled to, and which should not have been given. In support of its motion for a new trial, the defendant filed two affidavits setting forth that three of the jurors had stated, two to one of the affiants, and one to the other affiant, that the jury arrived at their verdict in respect to the damages by each juror writing down the sum he thought the plaintiff was entitled to, then adding the several sums together and dividing the total by twelve. Had the affidavits been made by the jurors themselves, they would not have been admissible to impeach their verdict, and much less is mere hearsay evidence of the unsworn statements of jurors admissible for such purpose. Phillips v. Town of Scales Mound, 195 Ill. 353, 364, and cases there cited.

The motion for a new trial was properly overruled, and the judgment will be affirmed.

*Affirmed.*